IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JACK BROWN                                                          Civ. No.11-953-AC

                          Plaintiff,                              FINDINGS AND
                                                                    RECOMMENDATION

      v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                          Defendant.

_____

ACOSTA, Magistrate Judge:

*Introduction*

       Claimant Jack Brown ("Claimant") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA") and for

Supplemental Security Income ("SSI") disability benefits under Title XVI of the SSA.  *See* 42

FINDINGS & RECOMMENDATION                    1                              {JAP}

U.S.C. §§ 401-433 and §§ 1381-83f (2010).    This Court has jurisdiction to review Commissioner's decision pursuant to 42 U.S.C. § 405(g).    Following a careful review of the record, the court overturns the Commissioner's decision to deny benefits and remands for an award of benefits.

## Procedural History

Claimant filed an application for DIB and SSI benefits on November 2, 2007, wherein he alleged a disability onset date of June 28, 2006.    The claim was denied initially on January 23, 2008, and upon reconsideration on August 26, 2008.    On October 15, 2009, a hearing was held before an Administrative Law Judge ("ALJ"), who issued a decision on November 12, 2009 finding Claimant was not disabled.    Claimant requested review of this decision on April 15, 2011.    The Appeals Council denied this request on June 7, 2011, making the ALJ's decision the Commissioner's final decision.    Claimant filed for review of the final decision in this court on August 9, 2011.

## Factual Background

In late 2005 and throughout the first half of 2006, Claimant visited physicians at Kaiser Permanente, where he complained of chronic upper and lower back pain, controlled with occasional days off and prescription medication that included Vicodin and muscle relaxants. During his February 10, 2006, visit with Dr. William Nyone, Claimant related that on February 3, 2006, he was lifting five-gallon buckets of paint and hurt his back.    This led to Claimant taking more than his usual dosage of Vicodin to manage his back pain. (Tr. 343.)

On June 28, 2006, while working as a manager for Sherwin-Williams Paint Company, Claimant was lifting two 65-70 pound buckets of paint when he "blacked out" from intense pain. (Tr. 38.)    He was twisting to the left while holding one bucket in each hand when he lost

FINDINGS & RECOMMENDATION                    2                                    {JAP}

consciousness for roughly ten minutes, although he reports he did not fall down during the episode. (Tr. 268.) Claimant felt intense low back pain and had difficulty standing after regaining consciousness, while also developing a headache soon after. (Tr. 248, 348.) On July 3, 2006, Claimant visited Gresham Urgent Care and completed his application for worker's compensation. (Tr. 250.) Claimant was diagnosed with a "lumbar strain/spasm" and released on modified work duty. (Tr. 249.) This work duty included limited bending, stooping, squatting, climbing, pushing, pulling, and alternate sitting/standing. *Id.* Claimant was also limited to maximum continual lifting of zero to five pounds and maximum occasional lifting of five pounds. *Id.* Claimant was referred to physical therapy and ordered to have "no physical work this week." *Id.* At the time, he was not suspected to have a permanent injury and treatment was estimated to take two to four weeks. (Tr. 250.)

Claimant was initially seen by Dr. Sterling Piepgrass ("Dr. Piepgrass") on July 7, 2006, for treatment for the diagnosed lumbar strain. Dr. Piepgrass indicated Claimant had low back pain, left hip, and medial thigh issues, with "tingling" in the left buttocks. (Tr. 246.) Claimant was prescribed medication, including Vicodin, Flexeril, and Naprosyn, and ordered stationary for twelve weeks. *Id.* Claimant's work ability was modified so that no bending, stooping, squatting, climbing, pushing, pulling, and alternate sitting/standing was to be done. (Tr. 247.) Claimant's injury was also changed to "unknown" regarding possible permanent impairment. (Tr. 248.)

Dr. Piepgrass next saw Claimant on July 12, 2006, at which time Claimant's work ability was modified to allow for a maximum of two to three hours of work per day. (Tr. 245.) Claimant continued with that restriction through July 25, 2006, when it was noted by Dr. Piepgrass that Claimant complained of being in "a lot of pain after two hours at work." (Tr.

241.)  Claimant's work ability was modified to include limited bending, stooping, squatting, climbing, pushing, and pulling.  (Tr. 240.)  Dr. Piepgrass noted that Claimant had "poor prognosis progress" while refilling Claimant's Vicodin, Flexeril, and Naprosyn prescriptions on August 1, 2006.  (Tr. 236.)

"Slow progress" was noted by Dr. Piepgrass in Claimant's August 11, 2006, follow-up appointment.  Dr. Piepgrass noted that Claimant's sharp pains were less frequent and increased his activity level to up to four hours a day.  (Tr. 233.)  This level was decreased back to a maximum three hours following an August 18, 2006, appointment.  Claimant's stationary order from Dr. Piepgrass was extended for ten weeks, while noting that the prognosis was "no better." (Tr. 230.)

Claimant was seen by Dr. Michael R. Wilson ("Dr. Wilson") for an initial evaluation on September 1, 2006.  Dr. Wilson noted that Claimant complained of low back pain "tightness" that varied from "2-7/10."  (Tr. 309.)  Pain was explained as worse when walking, sitting, or lifting and straining.  *Id.*  Claimant also complained that the pain was affecting attention and concentration.  *Id.*  Dr. Wilson observed Claimant's left hip was popping and that there was a "decreased perception of superficial light touch in the left L3 and L4 distribution."  (Tr. 310.) Dr. Wilson noted that an unenhanced MRI of the lumbar spine dated July 17, 2006, showed a "minimal retrolisthesis of L5 on S1, mild posterior broad-based protrusion of the L5-S1 disc . . . and mild degenerative disc disease most prominent at L5-S1."  (Tr. 311.)  Claimant was assessed with a lumbar strain and a preexisting condition of degenerative disc disease and L5 on S1 retrolisthesis.[1]  *Id.*  The left hip and groin pain experienced by Claimant was unexplained at the

---

[1] Retrolisthesis is a rare degenerative disc disease that causes a displacement of a spinal vertebrae respective to its adjacent vertebrae.

time, but Dr. Wilson opined that "lifting heavy weight with twisting is a reasonable mechanism for hip intraarticular pathology." (Tr. 312.) Dr. Wilson concurred with the recommendation of Dr. Piepgrass in limiting Claimant to less than three hours of activity per day. *Id.*

Claimant had a nuclear medicine whole-body bone imaging study done on September 5, 2006. Dr. Kevin Semonsen ("Dr. Semonsen") noted that there were "minimal findings of asymmetric uptake in the low lumbar spine, likely the result of some early degenerative disk and facet disease." (Tr. 296.) Lumbar spine radiology showed a narrowing of the lumbosacral space, facet sclerosis of moderate severity at L3-4 on both the right and left sides, and a narrowed and mildly sclerotic joint at L2-3 on the right side. (Tr. 297.) A CT scan of the left hip, taken on September 7, 2006, showed a "wearing of the hyaline cartilage next to the base of the labrum posteosuperiorly." (Tr. 294.) Claimant met with Dr. Wilson to go over the results of these exams on September 21, 2006, where a "Likely Work-Related Diagnosis" was made of "L5-S1 disc protrusion with S1 radiculopathy[2] on the left." (Tr. 307.) Permanent impairment was not anticipated at the time. *Id.*

Claimant followed the advice of Dr. Wilson and received a left S1 epidural injection on October 11, 2006, but obtained little relief from the treatment. (Tr. 304.) Claimant reported that he was trying to be more active with routine walking, but that increased activity led to increasing pain symptoms. Claimant had estimated his limit of activity at around 45 minutes. *Id.* Claimant underwent electro-diagnotic testing of the left side, but no abnormalities were found. (Tr. 291.)

Claimant last saw Dr. Wilson on March 2, 2007, by which time the worker's compensation carrier had revoked Claimant's diagnosis of lumbar strain and, consequently,

---

[2] Radiculopathy is a painful condition caused by a compressed nerve in the spine.

denied Claimant continued medical treatment through the carrier health plan.  (Tr. 300.)
Although Claimant had increased his walking tolerance to 25 minutes, twice a day, he still
experienced back pain that would cause him to lose his balance, resulting in repeated twisted
ankles.  Claimant visited Dr. Wilson primarily for a refill of his Vicodin prescription.  *Id.*  Dr.
Wilson expressed reluctance to continue prescribing opioid medication, but agreed to grant one
final refill to taper withdrawal symptoms.  (Tr. 301.)

Claimant was seen by Dr. Amanda Wonnacott ("Dr. Wonnacott") on September 25,
2007, to establish a new care provider.  (Tr. 282.)  Claimant observed that if working or
exercising, pain would be a "6/10," with shooting pains down both legs.  Dr. Wonnacott noted
that Claimant's pain management medication package seemed to be working for him, but that a
urine drug screening would need to be completed before she would continue to prescribe the
same medications.  (Tr. 283.)

Claimant was seen by Dr. Wonnacott on November 19, 2007.  (Tr. 280.)  Claimant
mentioned that he had been able to walk ten blocks the previous day and had worked in the yard,
moving and stacking wood.  *Id.*  Pain would "come and go" and cause spasms.  It was revealed
that the urine drug screening required by Dr. Wonnacott had come back positive for marijuana.
(Tr. 281.)  Claimant admitted that he had used marijuana occasionally, but only when he was out
of pain pills.  (Tr. 280.)  Dr. Wonnacott did not refill pain medication at this time.  (Tr. 281.)

Claimant was seen by Dr. Christopher Komanapalli ("Dr. Komanapalli") for a functional
assessment on December 27, 2007.  Dr. Komanapalli noted that Claimant's wife is the primary
caregiver.  (Tr. 349.)  Dr. Komanapalli determined that Claimant could work no more than two
hours in a standard eight-hour workday, limited by Claimant's severe limitations in back range
of motion and injury.  (Tr. 351.)  Dr. Komanapalli also stated that Claimant could sit no more

than six hours in a standard workday and lift no more than ten pounds.  *Id.*  Postural limitations included no bending and only occasional stooping and crouching.  *Id.*  Manipulative limitations were also noted in the left arm, around the shoulder level.  *Id.*

Dr. Wonnacott continued to see Claimant throughout the first half of 2008, noting that he continued to test positive for marijuana.  (Tr. 373, 371, 414.)  Claimant reported being able to walk twelve blocks and trim trees, play basketball, and play with his dog.  (Tr. 370, 413.)  However, the increased physical activity led to Claimant being admitted to the hospital on June 17, 2008, when he felt short of breath and was unable to obtain relief from laying down in bed.  *Id.*  Dr. Wonnacott determined that the chest pain, lightheadedness, and nausea could be symptomatic of a new ailment, so, as a precaution, she ordered Claimant to check into the hospital for observation.  (Tr. 386.)  The admitting physician, Dr. Ruben O. Halperin ("Dr. Halperin") commented that the unexplained chest pain could be attributable to Claimant's musculoskeltal dysfunction, while also acknowledging that severe back pain could cause stress, which could, in turn, contribute to Claimant's symptoms.  *Id.*  Dr. Wonnacott met with Claimant on June 25, 2008, for a followup to Claimant's hospital visit, where she refused to fill Claimant's Vicodin prescription due to his continued marijuana use.  (Tr. 412.)

Claimant continued to be seen by Dr. Wonnacott, reporting that he was able to walk a mile in the morning and a second time in the afternoon, while also complaining of bowel difficulties.  (Tr. 449).  Claimant was routinely observed being able to get off of the exam table without any difficulty or assistance.  (Tr. 448, 450.)  A September 28, 2008, lumbar spine MRI conducted by Dr. Mari Kai ("Dr. Kai") confirmed Claimant's facet degeneration of the L4-5.  (Tr. 445.)  Claimant continued to complain of bowel difficulties, while Dr. Wonnacott noted the likelihood Claimant was suffering from panic attacks due to anxiety, so Claimant was prescribed

anti-anxiety medication.  (Tr. 448.)  Claimant was seen by Dr. Wonnacott on May 28, 2009, to

followup on his back pain.  (Tr. 440.)  Dr. Wonnacott noted that Claimant was walking several

times a week and was no longer biting his nails as a result of the anti-anxiety medication he was

prescribed.  Claimant was able to get out of a chair without difficulty and appeared healthy.  (Tr.

441.)

Claimant testified at the administrative hearing held on October 19, 2009.  He stated that

he can sit for no more than 45 minutes at a time and stand for no more than a maximum of three

hours.  (Tr. 39.)  At most, he says he can lift five pounds before the muscles in his back tighten

up.  (Tr. 46.)  He rated his pain as a 3/10 on his best days and 7/10 on his worst.  (Tr. 43.)

Claimant discussed the side effects of his medications, primarily that he has a hard time staying

awake and difficulties with concentration and focus.  (Tr. 44.)  He also attributed his problems

with memory to the medication.  (Tr. 50.)  Claimant noted that he has a medical cannabis card

and that he uses marijuana four days a week in conjunction with the Vicodin prescription.  (Tr.

45.)  He testified that he can walk four blocks, or once around a track.  *Id.*  He also stated he falls

two to three times a week due to his leg giving out.  (Tr. 58.)

*Summary of ALJ's Findings*

The ALJ engaged in a five-step "sequential evaluation" process when he evaluated

Claimant's disability, as required.  *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S.

137, 140 (1987).

I.    Steps One and Two

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful

activity since the onset of his alleged disability.  (Tr. 19.)  At Step Two, the ALJ determined that

Claimant had the severe impairment of degenerative disc disease.

Specifically, the ALJ referred to diagnostic testing that revealed early degenerative disc disease, as well as an MRI of Claimant's hip that disclosed deterioration of cartilage.  The ALJ acknowledged that Claimant suffered from degenerative disc disease, but noted that no record evidence established that these changes would cause permanent motor, sensory, or reflex loss.

II.    Step Three

At Step Three, the ALJ determined that Claimant's impairments do not meet or medically equal one of the listed impairments in regulations, specifically Section 1.00, Musculoskeletal System.  The ALJ found that no medical source indicated that Claimant's condition was equal in condition to the severity of any listed condition in listing 1.04 (disorders of the spine).

III.    Residual Functional Capacity

The ALJ concluded that Claimant has the RFC to "perform light work as defined in [the regulations], except he cannot climb ladders, ropes, or scaffolds; can occasionally climb stairs; cannot bend, crawl, kneel, use foot controls, work with dangerous unprotected machinery, at unprotected heights, or with vibrating tools."

IV.    Step Four

At Step Four, the ALJ concluded that Claimant could not perform any past relevant work, as past work that was at the "light exertional" to "exertional" level and would exceed Claimant's physical residual functional capacity.

V.    Step Five

At Step Five, the ALJ concluded that Claimant was capable of performing other work existing in significant numbers in the national economy.  In consideration of Claimant's RFC and vocational profile, the ALJ ruled that the full range of "light work" would not be possible

due to the physical limitations of Claimant, but that other jobs exist that Claimant would be suitable for. The vocational expert (the "VE") was given a hypothetical example of a similarly situated person to Claimant, and testified that, for that person, the occupations of hardware salesperson, auto rental clerk, and order detailer were suitable. These jobs all have significant local and national availability.

*Discussion*

Claimant objects to the ALJ's ruling on four grounds: (1) the ALJ erred by rejecting the opinion of the consultive examiner, Dr. Komanapalli; (2) the ALJ erred by not considering the side effects of Claimant's medication; (3) the ALJ erred in adopting semi-skilled jobs that Claimant could perform without identifying any transferable skills; and (4) the ALJ failed to include all of the limitations from the third party statement in Claimant's residual functional capacity. The court will address each objection in turn.

I.    Examining Physician

Claimant first argues that the ALJ erroneously rejected the opinion of Dr. Komanapalli, who was hired by Claimant to provide an examining opinion on Claimant's disability, but the ALJ rejected the opinion as not consistent with the medical evidence of record. Claimant argues that this is reversible error, because the ALJ did not give "clear and convincing reasons" for rejecting Dr. Komanapalli's opinion. Claimant bases this argument on the fact that the ALJ determined that Dr. Komanapalli's observations were not substantiated by the medical record, even though the opinion of Dr. Komanapalli was consistent with the opinion of Dr. Piepgrass, the initial treating physician of Claimant post-onset of disability. Also, Claimant notes that the ALJ made clear that Dr. Komanapalli's specialty in orthopedics factored into the decision to give the doctor's opinion "limited weight." The Commissioner replies that the ALJ did properly

evaluate Dr. Komanapalli's opinion, arguing that a "specific and legitimate" reason was given for rejecting the opinion, namely that it was inconsistent with the determination of Dr. Eder. The Commissioner argues that it is the ALJ's prerogative to weigh credibility when conflicting medical opinions are presented, and medical record evidence persuaded the ALJ to accept the conclusions of Dr. Eder over those of Dr. Komanapalli even though both opinions were considered. The court finds that the ALJ did not give specific and legitimate reasons for giving limited weight to the opinion of Dr. Komanapalli and committed error in this regard.

As a general rule, the Ninth Circuit recognizes a hierarchy that gives more weight to the medical opinion of a treating source first, an examining source second, and a non-treating non-examining source last. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "[C]lear and convincing reasons" must be given for rejecting an uncontroverted opinion of the examining physician. *Id.* "The opinion of a nonexamining medical advisor cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining or treating physician." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999). "When a nontreating physician's opinion contradicts that of the treating physician – but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician – the opinion of the treating physician may be rejected only if the ALJ gives 'specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Id.* at 600 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)); *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). The ALJ must consider all opinion evidence in making the determination on a disability claim. 20 C.F.R. § 404.1527(b) (2012). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings." *Magallanes*, 881 F.2d at 751 (citation omitted). "The ALJ must set out in the record his reasoning and the evidentiary support for his interpretation of the medical evidence." *Lester*, 81 F.3d at 832. "While the ALJ is not required to discuss every piece of evidence, he may not omit evidence that is significant or probative." *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003). The court may find such omissions harmless only where they are "inconsequential to the ultimate nondisability determination." *Carlson v. Astrue*, 682 F. Supp. 2d 1156, 1168 (D. Or. 2010) (quoting *Carmickle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008)).

Here, the ALJ found inconsistencies between the medical record and the opinion of Dr. Komanapalli. Dr. Komanapalli reviewed Claimant's medical records, including the evaluation of Dr. Wilson, testing and examination reports, and clinical data. Dr. Komanapalli described Claimant's daily activities:

> He essentially spends all day every day in the bed or recliner. He is unable to be on his feet for more than 15-30 minutes a day at a time. He is quite reasonable in his depiction in his level of function. He has difficulty climbing stairs. He is able to bend over 20 degrees, but he has difficulty getting back up. He is able to reach for objects without difficulty on his left arm, but he has significant reduction of his right to about shoulder level. He is able to manage small objects with his hands.
> The [C]laimant is able to perform self-care, including toileting, bathing, and dressing himself; although, he does receive the majority of his care due to his wife who takes more care of him than he does of himself. He does hear and speak normally, but he does not drive or travel.

(Tr. 348-49.) Dr. Komanapalli also observed Claimant was "well developed and well nourished" and in "no acute distress." (Tr. 349.) He also noted that Claimant had difficulty getting up from his chair without assistance from his wife, but that when seated, he was "comfortable." *Id.* In diagnosing Claimant with "[s]evere back pain," Dr. Komanapalli made the following functional assessment:

> The number of hours the claimant could stand and walk in an eight-hour workday is less than two hours, limited by his severe back range of motion and back injury. The number of hours the claimant could sit in an eight-hour workday is less than six hours. . . .
> The amount of weight the claimant could lift and carry is less than 10 pounds frequently and occasionally, limited by his back range of motion.
> There are postural limitations on bending, limited to never; stooping to occasionally; and crouching to occasionally secondary to his limited back range of motion.

(Tr. 351.)

Dr. Komanapalli's recommendation is in line with the diagnoses of Dr. Piepgrass,[3] Claimant's initial treating physician, and Dr. Wilson,[4] a second treating physician. Both treating physicians observed that Claimant's condition was not improving. Dr. Piepgrass first noted that Claimant's condition was getting "better slowly" but later noted that there was "poor prognosis progress" and, ultimately, that Claimant was "no better." (Tr. 239, 236, 230.) The diagnosed lumbar strain was severe enough for Dr. Piepgrass to note on Claimant's worker's compensation claim report that it was "unknown" if Claimant would be permanently impaired. (Tr. 248.) The medical testing ordered by Dr. Piepgrass was utilized by Dr. Komanapalli in forming the latter's determination of Claimant's work ability. (Tr. 347.) Dr. Komanapalli's conclusions are substantially similar to those of Claimant's initial treating physician, Dr. Piepgrass.

Dr. Wilson's treatment notes also corroborate Dr. Komanapalli's recommendation. Dr. Wilson noted that Claimant had evidence of degenerative facet disease and also observed

---

[3] As stated in the facts section, Dr. Piepgrass recommended Claimant be limited to, at most, three hours of work a day, with limited bending, stooping, squatting, climbing, pushing, and pulling. (Tr. 231.)

[4] Dr. Wilson also agreed with the recommendation of Dr. Piepgrass and added that Claimant be restricted from lifting anything greater than 5 pounds. (Tr. 311.) Dr. Wilson also agreed with the diagnosis of degenerative disc disease and determined that Claimant's L5-S1 disc protrusion with S1 radiculopathy was a work-related injury. *Id.*

Claimant showing signs of pain in his right hip while sitting. (Tr. 321-22.) Dr. Wilson determined that Claimant had no significant changes in pain symptoms in the leg or back with recommended treatment therapy. (Tr. 318.) While Dr. Wilson did not address Claimant's potential for returning to work (other than to agree with Dr. Piepgrass's recommendation of no more than three hours of work after the initial consultation with Claimant), he did note that physical activity of Claimant during examinations produced pain symptoms, although it was noted that Claimant tended to "amplify" his discomfort. (Tr. 317.) Dr. Wilson administered a series of electro-diagnostic tests to Claimant, which found that Claimant had no evidence of lumbosacral radiculopathy or generalized neuropathy of the left lower limb. (Tr. 328.) Although Dr. Wilson did not rule out the possibility of a work-related injury, Claimant's worker's compensation insurance was revoked and, as a result, Claimant was unable to continue the recommended treatments. (Tr. 315.) Dr. Komanapalli's observations of Claimant echoed those of Dr. Wilson, as both physicians noted Claimant's dependence on pain medication to make it through the day.[5] Both physicians also noted Claimant's increased tolerance for walking.[6] Dr. Komanapalli's report is not inconsistent with the medical record established by Dr. Wilson.

In spite of the agreement of medical opinion between Claimant's treating and examining physicians, the ALJ assigned probative weight to the opinion of the non-examining physician,

---

[5] Dr. Wilson noted that Claimant's primary reason for the Mar. 2, 2007, followup visit was to obtain medication refills. (Tr. 315.) Dr. Komanapalli wrote that Claimant needed three kinds of pain medication, but primarily spent all day in a bed or recliner. (Tr. 348.)

[6] Dr. Wilson noted that Claimant's increased walking tolerance included being able to walk up to 25 minutes at a time. (Tr. 315.) However, Claimant claimed that increased walking would cause back pain to the extent that he would lose his balance and fall, sometimes twisting his ankle. *Id.* Later, Dr. Komanapalli noted that Claimant could walk two to three blocks. (Tr. 348.)

Dr. Sharon Eder ("Dr. Eder"), the state agency physician who evaluated Claimant's residual functional capacity, primarily using the reports of Drs. Piepgrass and Komanapalli. Dr. Eder determined that Claimant would be able to stand and walk at work six hours in a workday, while also being able to sit the same number of hours a day. Dr. Eder discounted the statements of Claimant's pain, saying that the wearing of hyaline cartilage could cause some limitations "but not to the degree that [C]laimant and third party are stating." (Tr. 361.) Dr. Eder further found that Claimant's statements were "not fully credible" as to his level of functioning, as increased walking tolerance, working in the yard, and stacking wood were evidence of an increased ability to perform work-like skills. *Id.* Dr. Eder discounted the opinion of Dr. Piepgrass because, while reasonable, the treatment period was "within the acute post-injury timeframe." (Tr. 362.) Dr. Eder also gave limited weight to Dr. Komanapalli's opinion as "inconsistent with the objective medical evidence" regarding Claimant's manipulative limitations. (Tr. 362.)

The ALJ improperly disregarded Dr. Komanapalli's medical opinion despite the corroboration of substantive record evidence. The Commissioner is correct that the ALJ has the duty to decide between conflicting medical opinions and may use a credibility determination to assist with that process. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). However, in weighing the recommendations of Dr. Eder and Dr. Komanapalli, the ALJ failed to give clear reasons as to why Dr. Eder's non-treating opinion was more credible. To properly reject an examining physician's report, the ALJ must give specific and legitimate reasons based on the evidence in the record. *Lester*, 81 F.3d at 830-31. The ALJ provides little reasoning for the rejection of Dr. Komanapalli's opinion, other than to use Claimant's medical complaints to Dr. Komanapalli as justification for attacking the credibility of Claimant's statements. This does not

rise to the level of a clear and convincing reason for rejection of an examining physician's opinion, and is reversible error on the part of the ALJ.

The ALJ also limits the weight given to Dr. Komanapalli because of his specialty in orthopedics, in contrast to the greater weight given to Dr. Eder, a specialist in internal medicine. The ALJ did not explain why internal medicine is more persuasive. Claimant's disability claim originates from issues concerning his lower back and spine, areas more likely within the specialty of orthopedics. Specialists are given greater deference when evaluating medical claims. *Benecke v. Barnhardt*, 379 F.3d 587, 594 n. 4 (9th Cir. 2004). Claimant and the Commissioner both agree that Dr. Komanapalli is qualified to opine on Claimant's pain symptoms. However, here the ALJ failed to give sufficient reasons for discounting Dr. Komanapalli's orthopedics speciality.

The ALJ dismissed Dr. Komanapalli's report due to the doctor's reliance on Claimant's self-report, which the ALJ found less than credible. The ALJ dismissed Claimant's pain testimony as exaggerated and his functional limitations as hyperbole. (Tr. 23.) While it is true that some statements by Claimant to one doctor may not be identical to those given to another doctor, the statements do not conflict in a matter sufficient to justify rejecting all of Claimant's testimony. Substantial evidence in the record shows that Dr. Piepgrass and Dr. Wilson both observed Claimant showing signs of intense pain and recommended limitations on a variety of physical activities related to work. Further, Claimant's father wrote of his own observations of Claimant's difficulties in functioning on a daily basis and the VE testified that Claimant's difficulties with bowel incontinence would prohibit competitive employment. The ALJ disregarded this supporting evidence only because Claimant expressed that he attempted to follow doctor's orders by walking daily and, on one occasion, over-exerting himself by dribbling

a basketball and playing with his dog, activities that subsequently landed him in the hospital. Social security regulations do not require claimants to be totally incapacitated to be eligible for disability benefits. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). No specific findings sufficient to justify rejection were given, and substantial evidence favors adoption of Claimant's pain as true.

The Commissioner's argument regarding the temporality of Dr. Piepgrass's recommendation is also unpersuasive. The Commissioner argues that the ALJ properly dismissed Dr. Piepgrass's opinion because the opinion was given within the first twelve months of Claimant's injury. The Commissioner relies on *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155 (9th Cir. 2008), as establishing that medical opinions regarding temporary disability is of limited use to ALJs in determining a claimant's long-term functioning. In *Carmickle*, the claimant suffered from degenerative disc disease and was examined by a physician who initially opined that the claimant's return to work was unlikely, but two months later authorized the claimant to return to full duty. *Id.* at 1165. The ALJ assigned limited weight to the opinion of the physician because it was based on a temporary disability. This court does not find *Carmickle* analogous to the present Claimant's situation. Unlike the temporary disability suffered by the *Carmickle* claimant, Claimant here has not been authorized for work at the full-duty level by any of his treating or examining physicians. While Dr. Piepgrass's observations of Claimant occurred during the first two months post-injury, the opinion of Claimant's prognosis for his back pain was echoed by Dr. Wilson and Dr. Wonnacott over the for over two years after injury. Furthermore, the ALJ never referred to a duration requirement in discounting the opinion of Dr. Komanapalli, so it would be improper for the court to rule on this post-hoc argument posed by

the Commissioner.  The duration argument fails, and Dr. Piepgrass's opinion was properly relied upon by Dr. Komanapalli.

The ALJ committed reversible error in minimizing the determination of Dr. Komanapalli. The court must respect the determination of the ALJ when the ALJ makes a choice between reasonable, but contrary, medical opinions, so long as the ALJ lays out specific reasons for doing so.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).  Here, the ALJ failed to make clear and convincing reasons for rejecting Dr. Komapanalli's medical opinion.  While the ALJ notes that Claimant's statements to Dr. Komanapalli were inconsistent with Claimant's statements to other treatment providers, these statements do not rise to the level of substantial evidence of malingering.  (Tr. 23.)  The ALJ can properly discredit a treating physician's opinion when it is based on discredited self-reporting by the Claimant.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  However, here the ALJ did not properly discredit the self-reporting by Claimant.  As a result, the ALJ erred in rejecting the opinion of Dr. Komanapalli and the matter must be remanded on this issue.

## II.      Side-Effect Testimony

Claimant next argues that the ALJ improperly rejected Claimant's statements regarding side effects of his medication.  Claimant argues that no mention of Claimant's testimony regarding side effects is written in the RFC, implying that the ALJ committed error by not considering those statements.  The Commissioner argues that ALJs are required to only consider side effects as one of many criteria in formulating an RFC.  In addition, the Commissioner argues that Claimant's continued use of marijuana is a factor that the ALJ would have to consider before evaluating Claimant's side effects.  The court concludes that the ALJ properly

evaluated Claimant's medication usage in formulating the RFC, and thus finds no reversible error.

At hearing, Claimant testified that Vicodin was his main source of pain relief medication. (Tr. 44.)  He further testified that the medication makes it hard for him to stay awake and that doing any task requiring a great deal of concentration due to his exhaustion.  *Id.*  This includes activities such as reading, which Claimant said takes an extended period of time to complete due to the frequent breaks required.  (Tr. 50.)  Claimant also stated that he had issues with memory and focusing, a problem that he never had before the injury and medication regimen.  *Id.*  Upon cross-examination by counsel, Claimant stated that he noticed a difference between medication side effects and simple pain: the medication made Claimant "groggy" and unable to concentrate, whereas the pain made it so that "you just want to black out."  (Tr. 60.)  The VE testified at the hearing that a similarly situated person, with concentration issues and problems in focusing, would most likely not be able to retain competitive employment.  (Tr. 72.)  Claimant also filled out a pain questionnaire, in which he listed his medications and their side effects, namely drowsiness and difficulties in focus.  (Tr. 199.)  Also, Claimant's father submitted a third-party statement in which he indicated that Claimant's ability to function depends on "what type of pills he takes."  (Tr. 184.)  The ALJ concluded that Claimant was not credible in describing the side effects of his medication.

The ALJ is tasked with making "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958.  The Ninth Circuit has an established two-step process for evaluating a claimant's subjective statements when credibility is at issue.

> In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms. The *Cotton* analysis is a threshold test that we set out in *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir.1986) . . . . If the claimant produces evidence to meet the *Cotton* test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. *See Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir.1993).

*Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citations omitted).  Claimant credibility determinations by the ALJ can take into account many different factors, including: "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between testimony and conduct, claimant's daily activities, work record, or testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which [claimant] complains."  *Coley v. Astrue*, No. CV 09–3050–PK, 2010 WL 3220300 (D. Or. 2010) (quoting *Light v. Soc. Sec. Agency*, 119 F.3d 789, 792 (9th Cir. 1997)).  The ALJ is required to assess a claimant's credibility in light of the type, dosage, effectiveness, and side effects of any medication taken by the claimant for pain and symptom relief.  SSR 96-7p, 1996 WL 374186 (July 2, 1996).  If the claimant does not provide objective evidence that side effects of medication impede the claimant's ability to work, then the court must not infer an inability to work from the claimant's subjective evidence.  *See Roquemore v. Comm's of Soc. Sec. Admin.*, 374 Fed. App'x 693, 695 (9th Cir. 2010) (where claimant's own claims of drowsiness and decreased concentration were only evidence offered of medicinal side effects, the ALJ had no reason to discuss side effect analysis in the ruling).

Claimant argues that there is substantial medical record evidence that Claimant's side effects would prohibit employment prospects and that the ALJ did not adequately articulate the reasons behind not accepting them.  This is inaccurate.  While the ALJ did not go into substantial

detail in addressing Claimant's side effects, the ALJ is not required to discuss every piece of medical evidence when making a determination of disability, provided that substantial evidence exists to support that ruling. *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003). Here, Claimant failed to follow the medication regimen of Dr. Wilson and Dr. Wonnacott, most notably in his continued use of marijuana while also taking narcotic pain reliever. (Tr. 20.) Dr. Wilson expressed concern about Claimant's opioid painkiller prescriptions, and told Claimant that the plan was to wean him off of opiate pain relievers. (Tr. 300-01.) However, Claimant not only remained on opiate painkillers, he supplemented that with marijuana. (Tr. 45.) While Claimant may currently have a medical marijuana card for legal use of cannabis, Dr. Wonnacott had previously refused to fill Claimant's prescription due to his continued positive urine analysis screens for the drug. (Tr. 45, 412.) Instead of following Dr. Wonnacott's recommendation to cease marijuana use, Claimant obtained an opiate painkiller prescription from his dentist. (Tr. 444.) Failure to follow a prescribed course of treatment can be used as evidence in a claimant credibility determination by the ALJ. *See Smolen*, 80 F.3d at 1284.

There is no error in the ALJ's determination that Claimant's statements regarding side effects allegedly suffered from pain medication lacked credibility and, thus, were not factored into the RFC. While Claimant may argue that not all of his functional limitations were properly reflected in the RFC, the ALJ sufficiently addressed Claimant's alleged limitations through a detailed and specific credibility analysis. Due to Claimant's lack of compliance with the medicinal treatment protocols of both Dr. Wilson and Dr. Wonnacott, the ALJ was proper in dismissing Claimant's testimony for its inconsistency with the medical evidence of record.

III.    Transferrable Skills

Claimant next assigns error to the ALJ's Step Five analysis which provided that Claimant could perform semi-skilled work, but failed to identify Claimant's transferrable skills that would permit him to adapt to said work.  Without identification of those transferrable skills, Claimant argues it is impossible to correctly formulate the Step Five determination of jobs in the national economy for which Claimant is suited to work.  The Commissioner argues, however, that Claimant's education level alone is sufficient for a finding that semi-skilled work would be appropriate.  The court finds that there was no harmful error in the omission of transferrable skills from the Step Five formulation.

"A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level." SSR 82-41, 1982 WL 31389 (Jan. 1, 1982).  Transferability of these skills to a new occupation is tested based on a likelihood that: "(1) the new job requires the same or a lesser degree of skill than the old job; (2) the same or similar tools and machines are used in both jobs; and (3) the same or similar raw materials, products, processes, or services are involved in both jobs."  *Aldrich v. Barnhart*, 151 Fed. App'x 561, 562 (9th Cir. 2005).  When looking at transferable occupations, the claimant's age and education level, along with prior work experience, are all factored into the calculations.  20 C.F.R. § 404.1563 (2008); 20 C.F.R. § 404.1564 (2012); 20 C.F.R. § 404.1565 (2012).

The ALJ consulted the Medical-Vocational Guidelines (the "Grids"), in addition to Claimant's age, education, past work experience, and RFC, in determining the transferability of skills to a new occupation.  (Tr. 24.)  Upon finding that the Claimant had the RFC to complete "light work," but with additional limitations posed by Claimant's condition, the ALJ consulted

with a VE to determine if there were jobs in the national economy that Claimant would have the requisite requirements for.  The VE testified that Claimant's former position as a paint store manager was a "light exertional position" with a specific vocational preparation ("SVP") of seven.  (Tr. 66.)   Given a hypothetical by the ALJ, which took into account Claimant's vocational profile (age, work experience, education), the VE testified that Claimant would qualify as a hardware sales person, automobile rental clerk, and boarder detailer, all SVP four positions of semi-skilled labor.  (Tr. 67-68.)  Neither the ALJ, nor Claimant's attorney, asked the VE about transferrable skills from Claimant's previous employment.   The transcript does reference "[INAUDIBLE] the past sales customer service" as an indication of skills Claimant may have had previously that would transfer to new employment, but this alone is insufficient to raise the issue in a meaningful way.  (Tr. 67.)

The court is not persuaded that the ALJ erred in not identifying transferrable skills.  The Claimant's argument here is similar to the argument rejected in *Watterson v. Astrue*, Civ. No. 10–060–JE, 2011 WL 7139424 (D. Or. Nov. 16, 2011).  In *Watterson*, the court analyzed a similarly situated claimant with an identical argument regarding an ALJ's omission of transferable skills from the Step Five analysis.  Like the Claimant here, the *Watterson* claimant relied heavily on the Ninth Circuit opinion in *Bray v. Comm'r of Soc. Sec. Agency*, 554 F.3d 1219 (9th Cir. 2009).  In *Bray*, the court rationalized that ALJs were required to list transferrable skills for claimants of "advanced age" due to the guidelines that state "advanced age" claimants should have little to no vocational adjustment required for new employment.  *See Bray*, 554 F.3d at 1224.  The *Watterson* court determined that *Bray* was not applicable to claimants who are not of "advanced age" according to the Grids.  As a result,

> a younger individual age 18 - 44 capable of sedentary or light work with Plaintiff's education and previous work experience is "not disabled" regardless of whether that person is unskilled, skilled or semiskilled and regardless of whether those skills are transferable or not transferable. The ALJ recognized that because the Plaintiff had additional limitations, the Medical–Vocational Rules did not direct a conclusion of disabled or not disabled but instead provided a framework to support a finding. Within that framework, under the facts of this case, transferability of skills was not material.

*Watterson*, 2011 WL 7139424, at *12 (internal citations omitted). The *Watterson* court made a distinction between "advanced age" and "younger individual" claimants who fall within the Grid listings, emphasizing the fact that, for transferrable skills arguments, "younger individuals" cannot rely on a lack of explicitly stated transferrable skills to overrule an unfavorable disability determination. The *Watterson* court went on to say that, even if the claimant was correct that the ALJ should have listed transferrable skills, that omission was a harmless error because it did not affect the disability determination at issue. *Id.* (citing *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990)).

This court is persuaded by the reasoning in *Watterson*. Claimant is a "younger individual" under the Grids, precluding him from benefitting from the *Bray* rationale for the "transferrable skills" requirement. The ALJ did not commit error in factoring in Claimant's vocational profile into the Step Five determination, without including the additional transferrable skills gleaned from Claimant's work history. Even if the ALJ erred in failing to identify transferrable skills, the court concludes that this error was harmless. Such omission did not affect the overall disability determination, and would not necessitate remand.

IV.   Lay Witness Testimony

Claimant's final argument for reversal centers on the limited weight given to the third-party functionality statement provided by Claimant's father, Jack Brown, Sr. ("Mr. Brown").

Mr. Brown made numerous observations in his report that the ALJ discounted or gave limited weight.  Claimant argues that the ALJ erred in only accepting some portions of Mr. Brown's statement while omitting others.  Claimant believes that, given full weight and consideration, Mr. Brown's statement would verify the legitimacy of Claimant's symptomatology.  The Commissioner argues that the lay witness testimony of Mr. Brown was properly discredited as incompatible with the medical record of evidence.  The court finds that the opinion of Mr. Brown was improperly discounted, was not incorporated into the RFC, and its omission constitutes reversible error.

Nonmedical sources are a source of information required of use by the Commissioner. *See* 20. C.F.R. § 404.1513(d)(4) (2011).  Where an "allegation [of a subjective symptom] is not supported by objective medical evidence in the file, the adjudicator shall obtain detailed descriptions of daily activities by directing specific inquiries about the [symptom] and its effects to . . . third parties who would be likely to have such knowledge."  *Smolen*, 80 F.3d at 1289; *see also* SSR 88-13, 1988 WL 236011 (July 20, 1988).  As such, "[f]riends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition."  *Carlson v. Astrue*, 682 F. Supp. 2d 1156, 1168 (D. Or. 2010) (quoting *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir.1993)).  This testimony "is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Hernandez-Devereaux v. Astrue*, 614 F. Supp. 2d 1125, 1150 (D. Or. 2009)  (quoting *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir.2001)); *see also* 20 CFR § 416.913(d)(4).  Inconsistency with the medical record is considered a germane reason for discounting of witness testimony.  *Lewis*, 236 F.3d at 512.

In her ruling, the ALJ factored in various observations from Mr. Brown in formulating Claimant's disability determination.  The ALJ cited, in particular, Mr. Brown's reports that Claimant used to go camping and still takes walks and does laundry as he is able.  (Tr. 22.)  In addition, the ALJ gave consideration to Mr. Brown's observation that Claimant cooks the main course at meals and goes Christmas shopping.  (Tr. 23.)  However, Mr. Brown's full report details relevant findings not considered by the ALJ.  Mr. Brown observed that Claimant cannot complete yard work.  (Tr. 182.)  He also observed that Claimant would be in pain doing normal lifestyle activities, such as bathing, cleaning, and dressing.  (Tr. 183.)  Mr. Brown believed that Claimant "hurts 24 hours a day" and cannot go out and socialize anymore.  *Id.*  Particular to Claimant's physical ability, Mr. Brown wrote that Claimant was inhibited in some way from lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using his hands.  (Tr. 184.)  The ALJ assigned "probative weight" to the opinion of Mr. Brown, saying that Mr. Brown's statements were consistent with the medical record.  (Tr. 23.)

The court finds that the ALJ did not properly consider the lay witness testimony of Mr. Brown.  The ALJ incorrectly omitted portions of Mr. Brown's report without giving a germane reason for doing so.  The court cannot infer the ALJ's reasoning where none is given.  *Cf. Harris v. Barnhardt*, 171 Fed. App'x 211, 214-15 (9th Cir. 2006) (when some reasons are given for rejecting testimony, the court can infer what additional reasons were not explicitly stated by the ALJ).  Omitting the portions of Mr. Brown's report that concerned Claimant's functional capacity is proper only with a sufficient explanation, not silence.  Substantial evidence exists that corroborates Mr. Brown's assessment of Claimant's pain and functional ability, and by assigning probative weight to the report, the ALJ is obligated to factor those findings into the RFC and

disability determination.  As a result, reversible error was committed and the ALJ must properly evaluate the third-party report of Mr. Brown.

V.    Standard for Awarding Benefits

The court has found that the ALJ committed error on two aspects of her ruling: the inadequate weight and consideration given to the medical testimony of Dr. Komanapalli, and the incomplete use of the lay witness testimony of Claimant's third-party evaluator, Mr. Brown.  If the ALJ had properly credited the medical opinion of Dr. Komanapalli, Claimant would be found disabled.   If the ALJ had properly considered the lay witness testimony of Mr. Brown in factoring the RFC, Claimant would be found disabled.  In light of these findings, the court must now evaluate the purpose of the remand order.

District courts have authority to remand ALJ decisions for further consideration in light of the court's findings, or for immediate awarding of benefits due Claimant.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).   The issue is whether there would be utility in further proceedings in light of those findings; when there is no useful purpose for further deliberation, or the record is fully complete and unsupportive of the commissioner's findings, then an award for damages owed to claimant is appropriate.   *Hernandez-Devereaux*, 614 F. Supp. 2d at 1151. With the *Smolen* ruling, the Ninth Circuit determined a three-step sequential test for determining whether a remand for benefits is appropriate.  A remand for benefits is appropriate when: (1) the ALJ failed to provide legally sufficient reasons for rejection of evidence or testimony, (2) no outstanding issues need to be addressed before a disability determination can be made, and (3) the record makes clear that the ALJ would be required to find the claimant disabled if the evidence or testimony had been properly considered.  *Smolen*, 80 F.3d at 1292.  Improperly discrediting a treating physician's opinion is grounds for a remand for an award of benefits.

*Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989). Creating a RFC that fails to incorporate claimant's limitations due to a failure to give proper credit to lay witness testimony also is grounds for remand for damages. *Hughes v. Comm'r of Soc. Sec.*, 403 Fed. App'x 218, 221 (9th Cir. 2010).

In the present case, a remand for benefits is most appropriate in light of the substantial evidence in the record supporting Claimant's inability to work. Multiple medical sources agree that Claimant suffers from intense back pain, with no improvement as a result of physical therapy and little improvement by way of Claimant's own physical activity. The VE testified that Claimant would most likely not be able to obtain employment when posed with a hypothetical from Claimant's attorney which accurately reflected Claimant's physical limitations, namely susceptibility to falls and fecal incontinence. Claimant's father's report emphasizes Claimant's functional inability to perform basic work duties without intense pain. Legal error was found in the ALJ improperly rejecting the medical opinion of Dr. Komanapalli and the lay witness testimony of Mr. Brown. No other issues remain to be determined in this case. Therefore, remanding to the ALJ for further consideration of medical opinion and lay witness testimony is unnecessary.

*Conclusion*

For reasons stated, the decision of the Commissioner denying the Claimant's application should be reversed and the case should be remanded to the ALJ for an award of benefits.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due September 3, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 20th of August, 2012.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge